**TURNER et al. v. HENDERSON et al.
(No. 5540.)**

(Court of Civil Appeals of Texas. Austin. Dec. 15, 1915. Rehearing Denied Feb. 16, 1916.)

1. CARRIERS &#9750;228—DAMAGES TO LIVE STOCK —SUFFICIENCY OF EVIDENCE—PAROL CONTRACT.

Evidence in an action for damages to a shipment of cattle *held* not to show that any parol contract of shipment was ever made.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 957–960; Dec. Dig. &#9750;228.]

2. CARRIERS &#9750;207—SHIPMENT OF LIVE STOCK —BILL OF LADING—EFFECT.

Where there was no contract for the shipment of live stock prior to the execution of the written contract signed by the shipper, the transportation of the live stock and the shipper under the contract constituted a valuable and sufficient consideration furnished by the carrier, rendering the contract binding upon the shipper.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 129–239; Dec. Dig. &#9750;207.]

3. CARRIERS &#9750;218—DAMAGES TO LIVE STOCK —NOTICE—REASONABLENESS.

A provision of a written contract for the shipment of live stock requiring written notice of loss or damage to the stock or delay in transporting it or decline in the market, etc., and the amount of damages claimed to be filed within 120 days thereafter with some traffic officer, station agent, or other convenient local agent of the carrier, in the absence of any showing that such notice could not have been given within such time, was a reasonable stipulation.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 674–696, 927, 928, 933–949; Dec. Dig. &#9750;218.]

4. CARRIERS &#9750;228—DAMAGE TO LIVE STOCK —DEFENSES—FAILURE TO NOTIFY OF LOSS— EVIDENCE.

Evidence in an action for damages to a shipment of cattle *held* to sustain the defense of the shipper's breach of a stipulation in the written contract of shipment requiring notice of loss, etc., to be given within 120 days to some agent of the carrier, and declaring that failure to give such notice should bar a suit for damages.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 957–960; Dec. Dig. &#9750;228.]

Appeal from District Court, Coleman County; John W. Goodwin, Judge.

Action by U. Henderson and others against Avery Turner and another, receivers of the Ft. Worth & Rio Grande Railway Company, and the Gulf, Colorado & Santa Fé Railway Company. Judgment for plaintiff against the receivers and in favor of the Gulf, Colorado & Sante Fé Railway Company, and the receivers appeal. Affirmed as to Gulf, Colorado & Sante Fé Railway Company, and as to the receivers set aside, and judgment rendered for them.

Andrews, Streetman, Burns & Logue, of Houston, and Lockett & Rowe, of Ft. Worth, for appellants. Critz & Woodward, of Coleman, for appellees.

KEY, C. J. U. Henderson, Will Dibrell, and H. Kingsbury brought this suit against the Gulf, Colorado & Santa Fé Railway company and the receivers of the Ft. Worth & Rio Grande Railway Company, and recovered a verdict and judgment for damages to a shipment of cattle from Menard, Tex., to Brownwood, Tex. No judgment was rendered against the Gulf, Colorado & Santa Fé Railway Company, and the receivers of the other company have appealed.

Appellants averred in their answer that the shipment was made under three written contracts, one between appellants and appellee Henderson, covering 219 head, another between appellants and appellee Kingsbury, covering 70 head, and the third between appellants and appellee Dibrell, covering 111 head of the cattle shipped; and appellants specially pleaded as a defense a stipulation in the contracts referred to, wherein appellees agreed, as a condition precedent to any right of action for loss or injury to the property shipped, or for delay in transporting same, or for decline in the market, to give notice in writing, setting out in detail a full statement of the losses, injuries, delay, and decline in the market for which damages are claimed, and the amount thereof within 120 days after the same shall have been occasioned, to some traffic officer, station agent, or other convenient local agent of the carrier. Appellants further alleged that such stipulation was, under the facts and circumstances of the case, a reasonable stipulation.

Replying to appellants' answer, appellees

denied that the written contracts pleaded by appellants were executed by appellees or either of them or by their authority. They further averred, in substance, that if they executed the contracts, they were without consideration and void, because of the fact that they were executed after appellants had received and accepted the cattle for shipment under a prior contract, that appellants demanded the signing of the contracts as a condition precedent to proceeding with the transportation of the cattle, and refused to transport same under the original contract, and that no additional consideration was received or paid for the execution of such written contracts. These allegations were specifically denied by appellants, as were all the other material allegations contained in appellees' pleadings.

Without discussing in detail the various assignments of error presented in appellants' brief, we announce our conclusions upon the merits of the appeal as follows:

The written contracts pleaded by appellants were introduced in evidence. The testimony shows that the stipulation in reference to notice was reasonable, and was not complied with, and fails to show any reason why the contracts are not valid and enforceable; and in support of these conclusions we copy from the statement of facts the testimony given by appellees themselves:

"My name is Upton Henderson. I am one of the plaintiffs in this case. I live at Coleman, Coleman county, Tex. I and the other plaintiffs delivered 419 head of cattle to Avery Turner and G. H. Schleyer, receivers of the Ft. Worth & Rio Grande Railway Company at Menard, Tex., 400 cows and 19 calves. They were put in the stock pens at Menard late Saturday afternoon, and loaded the next morning, Sunday morning, the 5th day of October, 1913. I had a conversation with Mr. Lang or some one Sunday morning. I think that was him; some one in the office. I don't know whether it was their agent here that was in the office. I had the conversation there with the man that was representing the railway company Sunday morning at the Frisco office at Menard. The man I was talking to was in charge of the office there. I told him how I wanted the cattle billed. I told him to Santa Anna. He said: 'All right.' The cattle were then in the stock pens. I was in his presence when I asked him if the cars were ready. I took the cattle and put them in the pens, and told him that I wanted the cattle billed. I went up to the stock pens, walked on up there; it was about three-quarters of a mile; and I think they were up there to load the cattle. The train I think was there before I got there, or very shortly afterwards, and started to load. They loaded them. It was the Ft. Worth & Rio Grande, the railroad from Menardville to Brownwood. It was pretty early in the morning Sunday, I suppose, maybe, 7:30, when I went up to the stock pens. It was not raining; both Sunday and Monday were sunshine weather. It was not raining when we got to Brownwood. After the cattle were loaded, I think we all rode down on the cars to the station—about three-quarters of a mile, I guess, a good long distance. At that time neither myself nor any of these plaintiffs had signed any written documents with reference to this shipment. None had been presented to me for signing by the company

at that time. The movement of the cattle from the stock pens to the depot was in the direction of Brownwood, in the direction of Santa Anna by rail. As to the condition of the cars, the floors, the way they were bedded, as to whether they were slick, wet or dry, I only examined the last two cars prior to loading, and I immediately went to look at the one into which they were fixing to load, and I says: 'You can't load into that car; its full of water.' I spoke to the man loading the cattle. He said: 'They are all that way.' They were pretty near all that way. The water was standing in puddles in places. One place three or four feet square looked like two inches deep in the car. I looked at the rest of them there, and they were standing in mud and slush, all of them. There were 11 cars. They had been bedded prior to the time I arrived there that morning. They remained in that condition all the way to Santa Anna. I accompanied these cattle from Menard to Santa Anna. One of those cattle was injured in loading there at Menard. One was injured at Menard in putting her in the chute to the car, and as she was being loaded her hind legs dropped in between a part of the chute and the platform at the stock pens, but she got in after they helped her up, but she was hurt in the hips, and some of the other cows run over her, but there was only one hurt there. As to the condition of the cattle when they arrived at Santa Anna, they arrived 4 dead, or 5. One we could not get up, and afterwards died, and several head more of them were badly bruised up. There were 4 dead, and 1 afterwards; we could not get it up, and I understand that it died afterwards. O, yes, sir; there was a market value for those cattle, those that died and those that were injured or bruised at Santa Anna at the time of the delivery. I think I was acquainted with the market value at the time of delivery. As to my experience in selling and buying cattle, I buy and sell quite a good deal, a bunch or two every year. I deal in cattle, raise them, and sell them. Right around $50 would have been the reasonable market value of those cattle that were killed and the one that I understand afterwards died, if delivered at Santa Anna alive and without any injuries or negligence on the part of the defendants—$50 a head. If one of these was a calf, then one of them about $18 or $20. Some of the other cattle that were delivered at Santa Anna were delivered in an injured condition. Some of them had rubbed against the cars and were skinned up. Some were skinned on the tail bones and had rubbed against the cars. As to whether the cars were handled so that they were jostled about or run smoothly and easily, well, the roadbed was pretty rough, and they had a good deal of switching along the road. I don't know what was done at Brownwood. We got off and went to supper, and they was transferred from the Frisco to the Santa Fé while we were gone to supper, and when we got back they were already hooked onto the Santa Fé train that was going to bring us out. As to how many of all these remaining 410 head, or 411 head, I believe it is, 414 head, of cattle were injured, well, so far as being injured goes, there was only 4 or 5 that we saw that morning that could hardly travel. I quit the cattle after the delivery there. The other two plaintiffs took the cattle home with them, and I came on to Coleman. The freight on those cattle was paid to the Santa Fé at Santa Anna after our arrival there. I did not pay any freight to the receivers and their agents at Menard. As to whether the cattle were transported to Santa Anna in the same cars in which they were loaded at Menard, we was away from the cattle anywhere from 35 minutes to an hour at Brownwood, but they looked like the same cars and had the same numbers and the same name that

they had when we got there. They could not have unloaded them; that would have been a physical impossibility, except one car at Brady; we unloaded one car there. I told the conductor that we ought to unload all of them and put them in cars that were bedded, and he said that would keep us there until Tuesday. Brady is on the Ft. Worth & Rio Grande Railway, on the road between Menard and Brownwood, and the same railroad that was operated by the defendants to whom I delivered the cows. I think that the correct number of the cattle was 419 head, 400 stock cattle and 19 calves. I was supposed to own 250, or five-eighths interest in them. I owned 250 head myself, Mr. Kingsbury owned 50 head. As to whether Mr. Dibrell owned the remaining 119 head, well, the cattle was not bought exactly that way. Each man was to get the calves that went with the mother cow when they were divided. The the division would be 150 and 250. I bought them for so much per head, with the calves thrown in, and I supposed that we would divide them that way. We had not discussed that part of it at the time, but it was the way they were divided. I bought the cattle in Menard county. They were range cattle. You ask if they were wild cattle. I answer, about like ordinary range cattle. Ordinary range cattle are wilder than cattle that do not run on the range. I don't think they are any more restless when confined in the cars than ordinary cattle. You ask, 'Don't these range cattle, when confined in a small pen or closed cars, don't they run over each other and hook and fight each other?' and I answer, not much, not more than any other cattle when put in a pen. Yes; I owned 250 head of those cattle. Mr. Dibrell owned 150 head, and Mr. Kingsbury owned the balance, except the calves, which go with the cows to which they belong. As to whether I had a conversation with Mr. Lang at the stock pens or at the depot, I may have had a second conversation at the stock pens. I had one at the depot before I went to the stock pens. The stock pens at Menard are about three-quarters of a mile from the depot, or something like that.

"We came on down there to the depot and signed our contract. As to whether I ship a great deal of cattle from Menard, I think I have had three shipments out of Menard. During the time I have shipped cattle from there I have never failed to sign a contract at the depot. The other shipments were previous to this shipment, one of them, and one since. You ask me whether I went ahead and loaded my cattle and then signed the contract each time, and I answer, yes, sir; signed my contract; yes, sir. I executed my contract at the depot at Menard. It is a fact that I loaded my stock there at the stock pens and pulled the train up to the depot, and then went in and executed the contracts. You ask me during the conversation I had with Mr. Lang didn't I state to him that I wanted three separate contracts, that I wanted one two-carload lot to Mr. Kingsbury, three-carload lot in the name of Mr. Dibrell, and the others in my name, and I answer, yes, sir. As to whether it is a fact that I stated to Mr. Lang that the purpose for which I wanted them billed that way was that I wanted the cattle looked after, and wanted transportation for the caretakers, I guess so; I might have done it; I don't remember. As to whether my recollection is that I had it done that way, I answer that I had the cattle billed that way. As to whether I have shipped a great deal of cattle in the course of my career, I will say not a great deal. I have shipped a good deal. I know that I cannot secure transportation for my caretakers unless I sign a written contract. That was my experience. Therefore I desired that the three separate contracts should be made that the proper trans-

portation could be given to the caretakers. (Mr. Rowe here exhibits to the witness the contract of shipment. Witness is asked whether he signed the contract shown him, and he answered:) I think I signed that. This here looks like my signature. I signed something like that. I am familiar with the signature of Mr. Kingsbury. I think that (indicating signature to the contract exhibited to him) is the signature of Mr. Kingsbury. I am tolerably well familiar with the signature of Mr. Will Dibrell. That (indicating signature to contract exhibited to him) is the signature of Mr. Dibrell.

"I knew the name of the agent at Menard for the receivers of the Ft. Worth & Rio Grande Railway Company. His name was Mr. Lang. I think I met him on that trip. I have known him ever since. I don't know who was the agent of the receivers of the Ft. Worth & Rio Grande Railway at Brownwood, Tex. I don't think I know Mr. Grizzard there. I know they have an agent there. I also know that the Gulf, Colorado & Santa Fé Railway Company has an agent at Brownwood. I did not know his name. At the time of this shipment, at the time this shipment arrived at Santa Anna, Mr. Brown was agent of the Gulf, Colorado & Santa Fé at Santa Anna. I do not know how long I have known him. I might say four or five, maybe seven or eight, years. I cannot recall the time that I met him. I suppose I have known him ever since he has been there. So far as I know, he is there now. He was there the last time I saw him. I do not know whether I know any of the general officers of the Gulf, Colorado & Santa Fé Railway Company. I don't think I know the names of any of the officers of the Gulf, Colorado & Santa Fé Railway Company residing at Galveston, Tex. I know Mr. Allen, their live stock agent. I do not know Mr. Pettibone. As to whether I know Mr. Dickinson, the live stock agent, I do if he lives at Ft. Worth. I am not acquainted with any of the general officers of the Ft. Worth & Rio Grande Railway Company or the receivers. I do not know the president. I know Ed Tillman, the live stock agent of the receivers. I think he is located at Ft. Worth.

"I filed my claim for damages with Mr. Dalton, the agent at Coleman. I spell it D-a-l-t-o-n. That was on March 18, 1914. I had made no written claim of my damages to any one previous to that time—not to any one. That was the only claim with reference to this particular shipment of cattle that I filed. As to whether it is a fact that I said the market value of the cattle that were killed was around $50, and that in my pleading I say that I paid $42.50 for them, we bought them when it was dry, and it rained, and they would be worth more. I think they would be $7.50 higher when they were shipped than when we bought them. As to whether I got the market that day at Santa Anna, we could sell them there. It was higher there. As to whether I got the market from Santa Anna that morning, I don't know that there was any market there. As to whether I got any market quotations at Santa Anna, I don't think they make any chalk marks on a blackboard. As to whether any one telephoning me that day and told me the market value of that cattle, grade, etc., on that day in Santa Anna, I talked to several the day I arrived at Santa Anna with the shipment. The statement as to the general market value of cattle on that day of that kind and grade was around $50. I mean to say that $42.50 was not the market value of those cattle; they were worth more money. You ask, 'As a matter of fact, you mean to state to the jury, don't you, that there was not any regular cattle market at Santa Anna where cattle are bought and sold?' and I answer, well, there are no pens there like the pens at Ft. Worth, no pens in which cattle are bought and sold daily; no, sir.

"In reference to the time I told Mr. Lang how I wanted the cattle billed out, and what I told him, I told him I wanted these cattle billed six cars to me, three to Dibrell, and two to Kingsbury. I don't know whether 'billed' is the word I used on that occasion. We wanted to get a special out of Brownwood, but he said he could not get the special. I don't know whether or not at the time I had this conversation there was anything said there by me or Mr. Lang in reference to the execution of a written contract on this Sunday morning. No, sir; I don't remember about that. You ask me, 'Do you remember whether or not there was anything said by you or Mr. Lang in reference to embodying in any contract the stipulation in reference to the plaintiff's giving written notice of any claim for damages?' and I answer, there was not. At the time I signed this written document shown to me here, alleged to be a contract, I did not read it. As to the circumstances under which I signed this written document, called a contract, we had been up at the pens loading the cattle and counting them. After they were loaded, why, we pulled on down to the station, the Frisco station in Menard. After the train was made up we rode on down to the station. We came back on the train, and went in to sign up. Mr. Lang said, 'Sign here and here and here' (indicating). As to how long it was from the time we got off the train there until we got in the station and signed them, just as fast as a bunch of men could work. The train was standing there waiting for us. As to what was said by the managers of the train in reference to shoving us up, Mr. Lang was working as fast as he could. The train was ready to go, they said. I don't know whether anything was said in regard to matter of transportation, as to whether or not it was necessary to get transportation for parties with the cattle. You ask, 'At the time you signed this document here shown to you by counsel for the defendant did you know the contents of it?' and I answer, 'I knew I had to sign to get transportation.' I did not know the wording of it. To the question, 'Was that document that was shown to you by Mr. Rowe just now that you stated was your signature, was that delivered to you or kept by them?' I answer that one was kept by them. I think that is a carbon copy. As to whether I know that is a carbon copy, that is my signature. No, sir; I don't know whether I received a copy of that contract or not.

"I had several conversations with Mr. Dalton in reference to my claim for these injuries prior to the time I filed this claim with Mr. Dalton about filing it at Santa Anna or here, Coleman. The first conversation I had with him a day or two after we arrived here. Mr. Dalton was at that time agent for the Santa Fé. You ask me to state the substance of that conversation. That was about all there was to it. I spoke about it, and he said he could handle it here for me and that I would be here. I had a conversation with Mr. Tillman in Ft. Worth. He is the general live stock commissioner or commission agent for the Frisco, the Ft. Worth & Rio Grande Railway Company. As to any prior conversation with any of the receivers or representatives of the receivers, I don't know whether I had a conversation with Mack-Allen or not. I tried to, but I don't remember. I wanted to get them together. I don't know the time of day, some time during the day. I signed the alleged contract that has been shown me here, I guess, about 10 or 10:30 in the morning, or maybe 11. We commenced to load the cattle, I guess, about 8:30. We put the cattle in the pens Saturday afternoon about dark the preceding day.

"You say, 'I don't know that I understand you, Mr. Henderson; your first conversation with Mr. Dalton you spoke to him about this matter, and your recollection is that he said

that it would be best for you to file the claim with the agent here at Coleman; that it would be best to file the claim here,' and I answer, I think that was the substance of it. Yes; he said for me to file the claim here; that he could take it up as well as the agent there.

"My interest in the cattle was 250 head, Mr. Dibrell 100, and Mr. Kingsbury 50. At the time of the shipment they had not been divided. I did not own all of any particular cows. I bought all of the cattle, and paid for them out of my own check, my individual check. At the time they were shipped they were still owned in the same way. Each of us had an undivided interest in the cattle, but I still had my check out for them. They had not been divided up to the time of the shipment. We all went down together to buy these cattle. I paid for all of the cattle myself; gave my check for them. There were no bills of sale executed.

"I think these written instruments, these three contracts, cover all the cattle, 419 head in all. As to whether I looked at the contracts and saw if they covered all, you will have to add them up and see. No, sir; I don't suppose they covered the calves. I do not know whether the calves or cows were left out of my own knowledge. The contracts cover 400 head. We shipped 419 head. I don't remember whether the ones left out were cows or calves. As to whether I told them that there were this many cattle, I told them how many cattle in the cars. I think somebody counted the number of them as they were loaded. I don't know whether that was me or my agents or some of defendants' agents. No, sir; I didn't say how many cattle were in the cars, I was at the pens at the time of the loading. All the calves were young calves; I suppose all July calves. The calves were with the cows; they were late calves."

## Will Dibrell, plaintiff, testified as follows:

"My name is Will Dibrell, I am one of the plaintiffs in this case. I was present at the time the cattle in controversy were put in the stock pens and loaded at Menard. We put them in on Saturday night and loaded them on Sunday, October 4, 1913. Personally I had nothing to do with the making of the original agreement with reference to shipping these cattle and loading them. I accompanied the cattle from Menard to Brownwood, and from Brownwood to Santa Anna. I did not observe the condition of the floors of the cars in which the cattle were shipped until they were loaded. I observed them then. They were wet, and water was standing in places in them, a good deal in some of them, and not so much in others. There was water in some of them. They were slick and hard for cattle to stand up in, the jostling and jerking cars. As to how the cars were handled, the roadbed, of course, is rough. It had been raining, and all the way it was more or less jerky. I don't think there was any more jerking than usually attends the running of railroad cars upon a rough roadbed. I was present when the cattle were unloaded at Santa Anna. They arrived there that night between 11 and 12 o'clock. I don't know exactly the time. Some of the cattle were dead when we got there, 4 cows and a calf, I think, or 3 cows and a calf; I don't remember. Am acquainted with the market value of cattle at Santa Anna at the time and place they arrived. As to what would have been the reasonable market value of the cattle that were killed at Santa Anna if they had been delivered there alive and without any injuries, they would have been worth around $50. As to whether I remember whether 4 or 5 of them were killed, one of them was not dead in the car, but died afterwards; that was included with the 4. One of them was a calf; $16 or $18 would have been the reasonable market value of that calf if delivered alive. I handled the cattle after they were unloaded and taken

out of the pens. Some of the cattle that were not killed were injured; they were bruised; some of them had their horns knocked off, were stiff and drawed from standing in the wet cars; some of them were skinned; some of them had fallen on the floor and had been trampled on by other cattle. A good many of the cattle were injured besides the 4 or 5 that were killed. I didn't·count them. Eight, or maybe 10, had their horns knocked off, and 25 or 30, maybe 50, were bruised some. All were injured more or less. Standing on that wet floor would make them sore and stiff. Yes; they were all injured in that respect to some extent. Having their horns knocked off and skinned, etc., would decrease the value.

"There was a market value for these cattle that day at Santa Anna at the time they arrived. I was acquainted with that market value. I have had experience buying cattle—a little. There is a local market there. I am certain I am acquainted with the market. You ask me to state to the jury what was the difference in the market value of those cattle at Santa Anna at the time and in the condition they were delivered and the condition they would have been delivered if delivered without these injuries, and I answer, $2.50 to $5 per head. The cattle had never been divided among the three plaintiffs at the time these cattle were delivered at Menard.

"At the time this written instrument here was signed I had not read it. It was signed at the same time Mr. Henderson signed the document of the same kind there (indicating). It was signed after they were loaded and pulled up to the freight office. I suppose the time of day was about 10:30 or 11. The cattle were put on the cars between 7:30 and 8 o'clock. As to the circumstances under which the contract was signed, I think the train was about ready to leave, and we walked into the office, and these documents were shoved out, and we signed them and went back and got on the train. We had no other conversation and agreement with Mr. Lang, or any one representing any of the defendants, in reference to signing any agreement of any kind. At the time I signed the document I did not know what it contained. Mr. Lang just shoved the papers out and said, 'Sign here.' I had no conversation with reference to it. I did not know when I signed that instrument that it contained a clause in there providing that as a condition precedent to any right of action for damages or loss of stock or decline in the market, etc., that you had to give notice of the damages and the statement of your claim within 120 days after the damages had been occasioned. The cattle shipped to Santa Anna were in the same cars in which they were loaded, except one car changed at Brady. They came over the Gulf, Colorado & Santa Fé from Brownwood to Santa Anna, and were delivered at Santa Anna by that railroad. Those cattle were range cattle. These cattle are not much more inclined to be restless or to horn or run over one another than other cattle. As to whether it is a fact that all range cattle, when confined in the narrow confines of a cattle car, will hook and fight each other and skin each other up, I say, not very much. Of course. they will a little, but they haven't room to fight and hook very much. They will fight and hook each other some. The bed was so slick that they didn't fight very much. I don't say they didn't, but I don't think they did very much. They were 11 cars. I didn't keep count of the cattle that were down. At every stop we got some cattle up. There was about one dead to each car; only one in each car dead. I don't think there was two in any one car. I would not be sure, because I don't remember. There were 11 cars in the shipment. I suppose all bedded the same.

"There was no market for cattle marked on the board at Santa Anna. There was no market like Ft. Worth and sales every day. It is a fact that the only transactions that occurred at Santa Anna, Tex., were transactions that occurred occasionally between individuals, who bought and sold to one another. We had no daily report of the market on cattle. No daily report came out in Santa Anna. They must have been 40 or 50 head injured, more or less, other than the ones killed. You ask me to describe the injuries. They were bruised and horns knocked off. Eight or 10 had their horns knocked off. The other cattle about which I will speak were bruised, I suppose by the cars. I expect there would be about 40 or 50 head that were bruised. Some were bruised more than others. The injuries would not be the same in every case. I don't know whether, when we reached Brownwood, the Santa Fé took the cars and put them on the transfer track. I went to supper when we pulled into Brownwood. I don't remember how long I was on the way from there. The only stop was to take out a car at Bangs. I didn't file any claim in writing until the 18th day of March, 1914. At that time it was filed with the Gulf, Colorado & Santa Fé Railway Company, Mr. Dalton here at Coleman.

"None of the cattle hooked their horns off prior to leaving. I have never known of cattle to hook their horns off out on the range. I never knew cows to hook one another so as to produce injuries like those out on the range. The balance of the cattle when they arrived at Santa Anna were sore and stiff. They were in good condition when delivered to the defendants at Menard. As to what, if anything, was the difference in the market value of these particular animals in the condition they were delivered to me at Santa Anna and without the bruises I have mentioned, and as to what, if anything, was the difference in these particular animals I have mentioned, with the conditions at the time of the delivery to me and the conditions without the bruises I have mentioned, I answer, $2.50 to $5 per head. As to whether I mean to tell the jury that these cattle that were stiff and sore were not injured more than those that were not stiff and sore, I didn't say that; I mean the cattle that were not bruised up and that had their horns knocked off and were bruised and skinned up were damaged something like $5 per head."

**U. Henderson, recalled by plaintiffs, testified:**

"I said I had a conversation with the claim agent for the Frisco receivers at the cattle convention, but it was at the fat stock show in the fall. I told Mr. Tillman about the shipment of the stock, and asked him if he could get Mr. McAllen and they get together and settle the matter without going to court. I told him what I thought the damages were. I told him what I thought the condition of the cattle was. He said to me to put it in would have plenty of time to file a claim."

**H. Kingsbury, plaintiff, testified as follows:**

"My name is H. Kingsbury. My initials are H. T. I am one of the plaintiffs in this case. My given name is Howard. I was in Menard at the time this shipment of cattle in question was put in the pens, and at the time they were loaded in the cars. I accompanied the shipment from Menard to Brownwood, and from Brownwood to Santa Anna. I was present at Santa Anna at the time they were unloaded. I did have something to do with taking them away from the pens, driving them away. I took some of them home with me; was acquainted with their subsequent condition after the time of the delivery at Santa Anna. They were in good condition when out in the pens of the receivers at Menard. None of them were bruised, skinned, or with horns knocked off or stiff when

I took them there. They were loaded Sunday morning about 7 or 8 o'clock. I observed the condition of the cars into which these cattle were loaded—the condition of the floors. Water was standing on the floors, and the water was gathered around in puddles around in the cars. The weather was clear. It was not raining; the sun was shining, and wasn't raining any at all. It did not rain on the way to Santa Anna. The cars were not bedded that day, so far as I know. They had been bedded when I got there. That was about 7 o'clock when they were bedded. The water was in there then. They had this water and mud in them. They were slick, and the cattle would slide on the floor. The cattle left the stock pens on the trains about 11 o'clock on the same day. They then went down to the depot, and somewhere close to a mile. We then went in and signed these documents. At the time I signed that document I did not know what it contained. I had had no previous conversation with the receivers or with any agent acting for them in reference to the matter of being required to give any notice within any specific time of a claim for damages, or anything of that character. At the time I signed that document I did not know it contained any provisions with reference to giving notice in writing of a claim for damages. As to whether I signed it at the time that Up. Henderson and Will Dibrell signed it, I think all signed it together. We all got off the train there about the depot. Mr. Lang was standing there in the depot, and put this paper out and told us where to sign it. I don't know whether he noticed the place where we signed. As to how much time we had between the time the contract was handed out there and the time we signed our names there, was done right now, a second or two. You ask, 'Did you at the time you put your signature to that see the other side, or did you just see that side?' and I answer, I think I just saw that side. As to whether in that connection I can state to the jury how many paragraphs of that document, how many of these particular paragraphs are on the side that I saw, I saw 13, 14, 15, and 16. I did not read any of these paragraphs. With reference to the other side, containing paragraphs from 1 to 12, I had never seen that at the time I put my signature to it on the other side. I think the other parties signed their documents in my presence. I could not say, but I think they signed theirs under the same conditions. I did not know at the time I signed that document the contents of it, and did not know what was printed on it, and what it contained.

"At the time this shipment was made I was acquainted, and am now acquainted, with the market value of these cattle at Santa Anna. Four of the cattle were dead, I think; 5 head dead, 4 in the cars. I believe 4 cows and a calf was dead; that is my recollection. I think around $50 would have been the reasonable market value, if they had lived; $15 or $16 would have been the reasonable market value of that calf, had it been delivered alive. The other cattle were injured. Some of them were skinned; others had been trampled on in the cars; others had their horns knocked off; some of them were injured internally. I had one that was down in the loins. I think 2 or 3 of the 50 head I took home from Santa Anna had their horns knocked off. I guess 10 or 12 head in all; 40 or 50 head were skinned and bruised. The rest of them that were not skinned and bruised and didn't have their horns knocked off were sore and stiff. In my opinion, they were stiff from being down in the cars. In reference to these cattle that had their horns knocked off and bruised, and the difference in their market value at the time they were delivered in Santa Anna and their value if they had been delivered without these in-

juries, some of them were practically unsalable, at that time and others were injured, and one that I didn't get home for a week. As to the difference in the market value of that one, she was unsalable; had to lift her in the road; $18 or $20, I think. As to the others would be from $2.50 to $5, I think. I was talking about those that were stiff. In reference to the cattle that had their horns knocked off and were bruised, and the difference in the market value of these cattle at Santa Anna at the time of the delivery there by the railroad company and in that condition and the market value if they had been delivered without these injuries, I will say, from $12.50 to $15. In reference to the cattle that were stiff and not bruised, and the difference in their market value at Santa Anna at the time they were delivered by the railroad company in the condition in which they were delivered, and the value if they had been delivered there without this stiffness, I will say, $2.50 to $5 per head.

"I think we went out to the train immediately after signing these contracts at Menard. It may have been some minutes before we left after we got to the train; I think so; I think it was some time. Mr. Henderson, Mr. Dibrell, and I rode on the transportation furnished in the three contracts executed by us. No; I filed no claim with anybody until March 18, 1914, when the other parties, my copartners in this transaction, filed theirs. That was the only one I filed with anybody. The cattle were shipped for the purpose of selling at any time; nothing was said about selling; they were put on the pasture. As to what was our intention in shipping these cattle for the purpose of selling them or for the purpose of pasturing them, we took them to a pasture. We did not ship to Santa Anna for the purpose of selling them. We intended to graze the cattle after we got to Santa Anna."

Appellee Henderson, being called as a witness for the Gulf, Colorado & Santa Fé Railway Company, testified:

"With reference to the conversation I had with the agent at Menard, as to whether I told the agent to get up the contract of so many of the cars in my name and so many in Dibrell's name, and so many in Kingsbury's name, I told him to bill the cattle that way. I did not use the word 'contract' in that connection. As to why I answered 'Yes' to that question, I did not understand the question, if he asked me the question in that way. I did not at any time request Mr. Lang to get up written contract. I know what the custom of railroads is with reference to issuing waybills on freight; issue waybills from one place to another.

"As to the cow that I testified about that fell through there as she was being loaded at Menard, she was injured at the pens, and she didn't stand up well. I think she was in the car when we transferred at Brady. I am not sure of that, however. As to what would have been the reasonable difference in the market value of that cow at Santa Anna in the condition she was put in the pens there and immediately before she was loaded and immediately after she was loaded, $50.

"As to whether I answered this morning that I instructed Mr. Lang, the agent of the Frisco at Menard, to make out three sets of contracts, one for two cars in the name of Kingsbury, three cars in the name of Dibrell, and the balance in mine, I told him to bill them. I instructed him to bill them that way. I expected to sign a contract in order to get that transportation. I did not expect to sign a contract containing a stipulation providing for giving written notice to the company as a condition precedent to my suit for damages arising from that shipment. As to why I expected to sign a written contract in order to get transportation, I have un-

derstood that was their rules, if you didn't sign the contract, you have to buy a ticket to pay your fare. There had been no conversation between me and the agent with reference to that matter."

[1, 2] We hold that the foregoing testimony fails to show that a parol contract of shipment was ever made, and therefore the written contract was binding. In Chicago, R. I. & T. Ry. Co. v. Halsell, 36 Tex. Civ. App. 522, 81 S. W. 1243, the Ft. Worth Court of Civil Appeals, speaking through Mr. Justice Stephens, said:

"In signing the contract of shipment, which limited the liability of appellant to damages occurring on its own line, appellee did but carry out the agreement which was implied when he had the previous oral negotiations with McCabe. He admitted very frankly, while testifying as a witness, that he expected to sign it when he talked with McCabe, ten days before the shipment. It was therefore but the consummation of this negotiation or contract with McCabe, and appellee was not in a position to avoid the binding force of the written contract, which took away none of the rights appellee would have had in the absence of any contract, oral or written. His own testimony made a clear case against him. The court therefore erred, as assigned, in giving the fifth paragraph of the charge. The case is not to be distinguished from that of Railway v. Wright [24 Tex. Civ. App. 291] 58 S. W. 847. The error was material, because the evidence undisputedly showed that the delay complained of occurred on the Choctaw, Oklahoma & Gulf Railroad; and it would be our duty to reverse, and render the judgment in favor of appellant, but for the joint liability alleged in the petition as a ground of recovery, in support of which some evidence was offered, though it may have been insufficient to prove such joint liability."

The only witness who gave any testimony in this case as to anything that was said prior to signing the written contracts was the appellee Henderson, and the substance of his testimony shows, as did the testimony of the appellee in the Halsell Case, that what occurred between him and appellant's agent was but an incomplete negotiation, intended to be consummated, as it subsequently was, by signing the written contracts relied upon by appellants. In the conversation referred to neither the number of cattle to be shipped and the freight charges to be paid nor any other details of the contract were mentioned; but Henderson merely told the agent that he wanted the cattle billed to Santa Anna, and testified, in substance, that he expected at the time he was talking to the agent to sign a written contract in order to get transportation. In other words, his testimony shows that he did not understand that the conversation between him and the agent constituted a verbal contract by which he had a right to have the cattle shipped, and that it was not his purpose in the conversation referred to to make a binding contract, and that he expected to have to sign a written contract. This being the case, we hold that no contract of shipment was made prior to the execution of the written contracts. There being no

prior contract for the transportation of the cattle, their transportation and the transportation of appellees under the written contract constituted a valuable and sufficient consideration furnished by appellants to render the contracts binding upon appellees. Railway Co. v. Wright, 24 Tex. Civ. App. 291, 58 S. W. 847; Railway Co. v. Barnett, 27 Tex. Civ. App. 498, 66 S. W. 474; Railway Co. v. Gallagher, 70 S. W. 97. It is true the jury found that a prior oral contract of shipment was made, but, as that finding is without evidence to support it, we hold that the shipment was made under the written contracts.

[3] The jury also found that the stipulation requiring notice was unreasonable, and that is the only remaining question which it is necessary to decide, and its decision is free from difficulty. The clear and undisputed proof coming from appellees themselves shows that they knew that appellant had station agents at Menard, where the cattle were shipped, and at Brownwood, where they were delivered to the connecting carrier; and they knew that the latter carrier had such agents at Brownwood and Santa Anna, the destination of the shipment. In fact, the proof shows that after the expiration of the 120 days allowed for giving written notice of the damages sustained appellees gave such notice to an agent of the Gulf, Colorado & Santa Fé Railway Company, the connecting carrier, at Coleman, Tex., which is the county seat of the county in which appellees reside; and no testimony was offered tending in the slightest degree to show that such notice could not have been given within the time required by the contract. In view of these facts, we feel compelled to hold that the stipulation referred to was reasonable, and that the finding of the jury to the contrary is wholly without support in the testimony. Railway Co. v. Honea, 84 S. W. 267; Railway Co. v. Heittner, 42 Tex. Civ. App. 617, 94 S. W. 189; Railway Co. v. Mayes, 44 Tex. Civ. App. 31, 97 S. W. 318.

[4] So our conclusion is that the undisputed proof sustains appellants' defense of a breach by appellees of the stipulation in the contract referred to, which requires the notice therein stipulated, and declares that the failure to give such notice shall constitute a bar to any suit for damages.

In regard to the points upon which we rest our decision, the record shows that the case has been fully developed, and, there being no indication that appellees can make it any stronger upon those points, it becomes our duty to reverse the case and render judgment for appellants.

Therefore the judgment in favor of the Gulf, Colorado & Santa Fé Railway Company is affirmed, but the judgment for appellees against appellants is set aside, and judgment is here rendered that appellees take

nothing as against appellants, and that all the costs be taxed against appellees.

Affirmed in part, and in part reversed and rendered.

On motion for rehearing the court reversed and remanded the case without writing a further opinion. In other respects the motion for rehearing was overruled.